UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| MINNIE P. COMMON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:05-CV-235 |
| v. | ) | |
| | ) | Edgar / Lee |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This action was instituted *pro se* by the plaintiff Minnie P. Common ("Plaintiff") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying the Plaintiff a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423 ("the Act"). This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil Procedure for a report and recommendation regarding the disposition of Plaintiff's motion for summary judgment [Doc. No. 16] and Defendant's motion for summary judgment [Doc. No. 22].

For the reasons stated herein, it is **RECOMMENDED** that: (1) the decision of the Commissioner be **AFFIRMED**; (2) the Defendant's motion for summary judgment [Doc. No. 22] be **GRANTED**; (3) the Plaintiff's motion for summary judgment [Doc. No. 16] be **DENIED**; and (4) the case be **DISMISSED**.

## Administrative Proceedings

Plaintiff filed an application for a period of disability and DIB under the Act on June 11, 2003, alleging she had been unable to work since January 1, 1999, due to the limitations imposed

by hypertension, gout, kidney disease/kidney failure, and high cholesterol (Tr. 52-55, 64).[1] After Plaintiff's application was denied initially and upon reconsideration, Plaintiff requested an administrative hearing (Tr. 31-46). A hearing before an Administrative Law Judge ("ALJ") was held on January 8, 2005 (Tr. 381-93). Plaintiff, who appeared *pro se*, her daughter, and a Vocational Expert ("VE"), James Friedlob, testified at the hearing (*id.*).

In a decision dated March 21, 2005, the ALJ found Plaintiff was not disabled through the expiration of her insured status on December 31, 1999 (Tr. 16-20). The ALJ's decision became the decision of the Commissioner on June 15, 2005, when the Appeals Counsel denied Plaintiff's request for review (Tr. 5-7).

## Standard of Review

The Court must determine whether the ALJ failed to apply the correct legal standard and whether the ALJ's findings of fact were unsupported by substantial evidence. 42 U.S.C. § 405(g); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997)). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the Court might have decided facts differently, or if substantial evidence also would have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not re-weigh

---

[1] Plaintiff's application for DIB alleges she became disabled as of January 1, 1999 (Tr. 52). However, she prepared a Disability Report in support of her DIB application which states she became unable to work because of her impairments on October 20, 1999 (Tr. 64).

2

the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers because it presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir. 1986). The Court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The Court of Appeals for the Sixth Circuit ("Sixth Circuit") has held that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner*, 745 F.2d at 388 (citation omitted).

### How Disability Benefits Are Determined

Disability is defined as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that disability claims are evaluated by way of a five-step sequential analysis. 20 C.F.R. § 404.1520. The five-step analysis is sequential because if, at any step, the claimant is found to be not disabled or to be disabled, then the claim is reviewed no further. 20 C.F.R. § 404.1520(a). The following are the five steps in the analysis:

Step 1: Is claimant engaged in substantial gainful activity? If so, claimant is not disabled. 20 C.F.R. § 404.1520(b).

Step 2: Does claimant have a "severe" impairment or combination of impairments

3

that significantly limits claimant's ability to do basic work activities, and will foreseeably result in death or last at least twelve months?  If not, claimant is not disabled.  20 C.F.R. §§ 404.1509, 404.1520(c), 404.1521.

Step 3:  Does the claimant's impairment meet or equal the criteria of an impairment described in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1?  If so, the claimant  is disabled, and the analysis may end without inquiry into the vocational factors.  20 C.F.R. § 404.1520(d).  If inquiry is made into vocational factors, then after step three but before step four, the Commissioner evaluates a claimant's residual functional capacity ("RFC"), which is defined as the most an individual can still do despite his or her limitations.  20 C.F.R. §§ 404.1520(e)-(f); 404.1545.

Step 4:  Does claimant's RFC permit claimant to perform claimant's past relevant work?  If so, the claimant is not disabled.  20 C.F.R. § 404.1520(f).

Step 5:  Does the claimant retain the RFC to perform other work in the economy?  If so, the claimant is not disabled.  20 C.F.R. § 404.1520(g).

The burden of proof is upon the claimant at steps one through four to show disability.  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391-92 (6th Cir. 1999).  Once the claimant has demonstrated the extent of claimant's RFC at step four, the burden shifts to the Commissioner to show that there is work in the national economy that may accommodate claimant's RFC.  *Id.*

### ALJ's Findings

The ALJ made the following findings in support of Commissioner's decision, which are conclusive if they are supported by substantial evidence in the record:

1.      The claimant met the disability insured status requirements of the Act only through December 31, 1999.

4

2.      The claimant did not engage in substantial gainful activity at any time relevant to this decision.

3.      The claimant has "severe" impairments, as described in the decision, but did not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.      The claimant's subjective complaints, including pain, are not fully credible relative to the period ending December 31, 1999.

5.      The claimant had the residual functional capacity to perform light work.

6.      The claimant's limitations would not prevent the claimant from performing past relevant work as presser.

7.      The claimant has not been under a "disability" as defined in the Social Security Act, at any time through the date of the decision.

(Tr. 19).

## Issues Presented by Plaintiff

Plaintiff asserts the ALJ's decision is not supported by substantial evidence [Doc. No. 17-1 at 1-4]. She "maintains that she has been disabled under the rules of the Federal Social Security Act from January 1999 through the current date" [*id.* at 4].[2]

## Review of Evidence

### *Plaintiff's Age, Education, and Past Work Experience*

Plaintiff was 55 years old at the time of the January 18, 2005 hearing and testified she completed her formal education through the tenth grade (Tr. 382). She reported past experience as a silk presser at a dry cleaner (Tr. 65, 74, 383). She alleged disability due to kidney disease,

---

[2] In addition to her summary judgment motion and supporting memorandum, Plaintiff has also filed a statement of undisputed facts [Doc. No. 18].

hypertension, pain, and cramps in her side and legs caused by her kidney disease, fatigue, and dizzy spells from her hypertension, gout and high cholesterol (Tr. 64, 73).

***Medical Evidence Prior to the Date of Last Insured***

Dr. Sonya L. Johnson, M.D. examined Plaintiff on October 19, 1999 (Tr. 139-40). Plaintiff was a new patient needing medication for her high blood pressure (Tr. 139). Plaintiff told Dr. Johnson she had not had any high blood pressure medication for about a year (*id.*). Plaintiff also stated she experienced shortness of breath on exertion and told Dr. Johnson she could not walk one flight of stairs without getting extremely short of breath (*id.*). Plaintiff's blood pressure was 231/119 and she weighed 271 pounds (*id.*). An EKG was also performed (Tr. 140). Dr. Johnson's impression was hypertension, severe and an abnormal electrocardiogram (*id.*). Dr. Johnson indicated she intended to admit Plaintiff to the hospital for 23 hours observation in order to rule out ischemia and start Plaintiff on medication to lower her blood pressure (*id.*). A chest x-ray dated October 19, 1999 was interpreted by Dr. John T. Johnson, M.D. as showing cardiomegaly and a lingular scar or atelectasis (Tr. 141). Plaintiff also underwent a myocardial perfusion study on October 19, 1999 (Tr. 142) interpreted by Dr. Charles Piez, M.D. as showing no firm evidence of myocardial infarction or ischemia (*id.*).

A hysteroscopy with dilatation and curettage was performed by Dr. James Nunally, M.D. on October 20, 1999 (Tr. 135-37). Dr. Nunally's postoperative diagnosis was menorrhagia with anemia, uteromegaly secondary to multiple fibroids, and large submucous fibroid. (Tr. 135). Dr. Nunally's findings as the result of the operation were morbidly obese abdomen and large 4-6 centimeter submucosal fibroid (*id.*).

On October 25, 1999, Dr. Johnson completed a statement for Plaintiff's employer (Tr. 143-44). Dr. Johnson diagnosed Plaintiff's condition as: (1) accelerated hypertension; (2) anemia; (3) abnormal EKG; and (4) status post dilation and curettage (*id.*). Dr. Johnson indicated the probable duration of Plaintiff's condition was "Hypertension - lifetime/Expect Recovery in 3 months" (*id.*). Dr. Johnson also indicated Plaintiff would need care and/or assistance for two to four weeks after she was dismissed from the hospital (Tr. 144).

Plaintiff was referred to Dr. Michael R. Geer, M.D. on November 22, 1999 for evaluation of an abnormal stress test and hypertension (Tr. 179-81). Plaintiff told Dr. Geer she had difficulty controlling her hypertension and, as a result, had only been taking one of her anti-hypertensive medications (*id.*). Plaintiff weighed 266 pounds and her blood pressure was 238/120 in the left arm and 246/120 in the right arm (Tr. 180). Dr. Geer indicated Plaintiff needed to be on a calcium blocker and, due to her obesity, should be on a diuretic (*id.*).

Dr. Geer saw Plaintiff again on November 24, 1999 for hypertension (Tr. 178). He stated she had done well since her last visit (*id.*). Her blood pressure initially was 200/108; however, after taking her medication and waiting 30 minutes it was 180/108 (*id.*).

A pelvic ultrasound was performed on December 30, 1999 (Tr. 237). Dr. John T. Johnston interpreted the ultrasound as showing multiple masses of various sizes consistent with multiple leiomyomata (*id.*).

Dr. Helena P. Perry, M.D. reviewed the records for the period prior to the date of Plaintiff's last insured and completed an assessment of Plaintiff's RFC for the relevant period on September 18, 2003 (Tr. 240-45). Dr. Perry indicated that during the relevant period Plaintiff could lift 20 pounds occasionally, ten pounds frequently, sit for about six hours out of an eight hour workday and

stand and/or work for about six hours out of an eight hour workday (Tr. 241).

### Medical Evidence After the Date of Last Insured

Dr. Geer saw Plaintiff on January 5, 2000 for hypertension (Tr. 176-77). He stated she was doing well and her blood pressure was 160/94 (*id.*). Dr. Geer's impression was that Plaintiff's weight and lack of exercise were playing a significant role in the management of her hypertension (*id.*). Dr. Geer recommended Plaintiff enroll in a cardiac rehabilitation program because he felt that weight reduction and dieting should be the next step in managing her hypertension as opposed to any additional medication (*id.*).

A chest x-ray was taken on February 1, 2000 (Tr. 231). Dr. John N. Galbraith, M.D. interpreted the x-ray as showing mild to moderate cardiomegaly and pulmonary venous hypertension, but no evidence of acute disease (*id.*). Dr. Galbraith also indicated the x-ray showed no change from January 1999 (*id.*).

Dr. Geer saw Plaintiff on February 8, 2000 (Tr. 175). Plaintiff had been scheduled to have a hysterectomy, but it was cancelled due to her blood pressure. Plaintiff had not taken all of her blood pressure medications based upon the advice of a nurse who was prescreening her for surgery (*id.*). Plaintiff's blood pressure was 160/102 in the right arm and 170/118 in the left arm (*id.*). Dr. Geer indicated Plaintiff's blood pressure was under suboptimal control, but that this may have been influenced by her not taking all of her medications (*id.*).

Plaintiff was hospitalized at Erlanger Medical Center from February 23 to February 26, 2000 (Tr. 149). In a discharge summary dated February 26, 2000, Dr. Nunally indicated the procedures Plaintiff had undergone during her hospitalization were (1) examination under anesthesia; (2) total abdominal hysterectomy with bilateral salpingo-oophorectomy; and (3) extensive lysis of adhesions

8

including enterolysis (*id.*). The discharge diagnosis was: (1) menorrhea unresponsive to medical management; (2) symptomatic uterine fibroids; (3) anemia secondary to menorrhea and symptomatic uterine fibroids; (4) extensive pelvic adhesions; (4) hypertension; and (6) hypokalemia (*id.*). Dr. Nunally indicated Plaintiff was to follow-up with him in two weeks and follow-up with her cardiologist, Dr. Geer, for a blood pressure check (Tr. 150).

Plaintiff was examined by Dr. Geer on February 24, 2000 (Tr. 158-59). Dr. Geer indicated he had been treating Plaintiff for significant central hypertension (Tr. 158). Plaintiff was on multiple medications for high blood pressure including Catapres, Norvasc, and Avalide and she was taking Lipitor for hypercholesterolemia (*id.*). Dr. Geer indicated his plan was to continue current therapy for now and replete potassium (Tr. 159).

Dr. Nunally completed a statement for Plaintiff's employer on February 25, 2000 (Tr. 163). He indicated Plaintiff underwent a hysterectomy on February 23, 2000 and would require four to six weeks for recovery (*id.*).

Dr. Geer saw Plaintiff on April 5, 2000, for a follow-up concerning her hypertension (Tr. 174). Dr. Geer indicated Plaintiff had been doing well. Her blood pressure was 170/100 in her left arm and 186/110 in her right arm (*id.*). A repeat check of the blood pressure in her right arm was 170/100 (*id.*). Dr. Geer indicated Plaintiff's blood pressure was under suboptimal control and he changed her calcium blocker (*id.*).

Plaintiff was again seen by Dr. Geer on July 11, 2000 for her blood pressure (Tr. 172-73). Plaintiff was taking Lipitor, one aspirin daily, Clonidine, Zoloft, Tiazic, Diovan, Lasix, and potassium (Tr. 172). Dr. Geer indicated Plaintiff's blood pressure initially was 180/100, but when it was retaken it was 160/98 (*id.*). Dr. Geer indicated Plaintiff was doing quite well, but her blood

pressure was not optimally controlled (*id.*).

Dr. Geer saw Plaintiff again on October 9, 2000, for her hypertension (Tr. 171). Plaintiff indicated she was having trouble taking her blood pressure medication in the morning because it made her sleepy (*id.*). Plaintiff's blood pressure was 210/118 (*id.*). Dr. Geer indicated Plaintiff's blood pressure was under suboptimal control and he changed her medication (*id.*).

Plaintiff was seen by Dr. Geer on March 19, 2001 for her high blood pressure (Tr. 170). Her medications included Lipitor, one aspirin daily, Clonidine, Norvasc, and Zestoretic (*id.*). Plaintiff's blood pressure was 160/94 (*id.*). Dr. Geer indicated Plaintiff's blood pressure was better (*id.*). He also indicated he discussed a weight reduction program with Plaintiff and that she would continue to be active and exercise at least three times per week (*id.*).

Dr. Geer saw Plaintiff on July 17, 2001 for a follow-up of her accelerated hypertension (Tr. 169). Her blood pressure was 198/92 (*id.*). Dr. Geer's assessment was that Plaintiff had suboptimal blood pressure control and a history of some renal insufficiency (*id.*).

Dr. Geer saw Plaintiff on September 25, 2001, for her malignant hypertension (Tr. 168). Her blood pressure was 190/110 and her medications included Clonidine, Norvasc, and Diovan (*id.*). Dr. Geer indicated Plaintiff's blood pressure was suboptimally controlled and he would add a beta blocker to her medication (*id.*).

Dr. Geer saw Plaintiff once more for her high blood pressure on October 8, 2001 (Tr. 167). He indicated Plaintiff had significant hypertension and evidence of renal insufficiency as a result of her hypertension (*id.*). Plaintiff's blood pressure was 170/90 (*id.*). Dr. Geer indicated Plaintiff's blood pressure was better controlled, however, her blood pressure medication was increasing her lower extremity edema (*id.*). Dr. Geer also indicated he had an extensive discussion with Plaintiff

about weight reduction in which he encouraged her to make a conscious effort to abstain from snack food over the next several weeks (*id.*).

Dr. Claude M. Galphin, M.D. saw Plaintiff on November 8, 2001 at the request of Dr. Geer (Tr. 274-76). Her chief complaint was proteinuria/chronic renal failure (Tr. 274). Dr. Galphin's assessment was: (1) chronic renal failure with proteinuria, likely secondary to underlying glomerulonephritis; (2) hypertension, poorly controlled; (3) mild volume overload; (4) hyperlipidemia; (5) obesity; (6) remote hysterectomy; and (7) right hip pain (*id.*). He stated Plaintiff would need to have her blood pressure controlled (*id.*). He stated Plaintiff was completely independent in most chores, although they took twice as long (Tr. 275). Plaintiff's blood pressure was 200/100 and she weighed 278 pounds (*id.*).

Plaintiff was also examined by Dr. Galphin on December 20, 2001 (Tr. 272-73). Her chief complaint was chronic renal failure. Dr. Galphin's impression was: (1) proteinuria, consistent with underlying diabetic nephropathy; (2) insulin-dependent diabetes mellitus; (3) hypertension; (4) neuropathy; (5) hyperlipidemia; (6) diabetic retinopathy; (7) history of diverticulosis; and (8) chronic renal failure (Tr. 272). Dr. Galphin indicated Plaintiff's blood pressure remained poorly controlled, although she indicated she was very compliant with her medications (*id.*).

Plaintiff was seen again by Dr. Galphin on February 15, 2002 (Tr. 269-71). His assessment was: (1) focal segmental glomerulosclerosis ("FSGS") consistent with a secondary FSGS with consideration of reflux nephropathy or chronic pyelonephritis; (2) hypertension, poorly controlled; (3) hyperlipidemia; (4) obesity; and (5) noncompliance (Tr. 269). Dr. Galphin stated Plaintiff had undergone a renal biopsy which suggested an "interstitial fibrotic pattern with lymphocytic infiltrate and tubular dilatation as well as glomerulosclerosis in a global and segmental pattern" (*id.*) He

indicated without improvement Plaintiff would be headed for dialysis (Tr. 269-70).  He described Plaintiff as completely independent in most chores, although they took twice as long (Tr. 270).  He also stated Plaintiff had been noncompliant with her diet, which included extreme amounts of high sodium foods, and her blood pressure control had been poor (*id.*).

Dr. Galphin again saw Plaintiff on May 2, 2002 (Tr. 263-65).  His assessment was: (1) advanced chronic renal failure secondary to focal sclerosing glomerulonephritis ("FSGN"); (2) anemia; (3) hyperlipidemia; (4) obesity; (5) hypertension, inadequately controlled; and (6) FSGN (Tr. 263).  Dr. Galphin stated Plaintiff had previously undergone a renal biopsy which documented a secondary type of FSGN (*id.*)  He described Plaintiff as completely independent and able to do all chores with some degree of slowness, difficultly, and impairment (Tr. 264).

Dr. Galphin saw Plaintiff on August 29, 2002 (Tr. 260-62).  His assessment was: (1) advanced chronic renal failure secondary to FSGN; (2) status post left forearm arteriovenous ("AV") fistula; (3) anemia; (4) hyperlipidemia; (5) obesity; and (6) hypertension, inadequately controlled (Tr. 260).  He described Plaintiff as completely independent and able to do all chores with some degree of slowness, difficultly, and impairment (Tr. 261).

Dr. Galphin also saw Plaintiff on November 25, 2002 (Tr. 257-59).  His assessment was: (1) advanced chronic renal failure secondary to FSGN; (2) status post left forearm AV fistula with poor development; (3) anemia; (4) hyperlipidemia; (5) obesity; and (6) hypertension (Tr. 257).  Plaintiff's primary complaints were being tired and intermittent constipation (*id.*).  He described Plaintiff as completely independent and able to do all chores with some degree of slowness, difficultly, and impairment (Tr. 258).  He stated Plaintiff was very obese and needed to lose weight for health reasons (*id.*).

Plaintiff was again examined by Dr. Galphin on January 28, 2003 (Tr. 254-56) for advanced chronic renal failure. Plaintiff stated she had been experiencing no significant lower extremity edema on her current medical regimen (Tr. 254). Dr. Galphin's assessment was: (1) advanced chronic renal failure secondary to FSGN; (2) status post left forearm AV fistula with poor development; (3) anemia; (4) hyperlipidemia; (5) obesity; and (6) hypertension (*id.*). Dr. Galphin stated Plaintiff was completely independent and was able to perform all chores with some degree of slowness and difficulty (Tr. 255). He also indicated some of Plaintiff's activities might take twice as long due to her condition (*id.*).

Dr. Galphin saw Plaintiff on April 3, 2003 (Tr. 251-253). Plaintiff's chief complaint was advanced chronic renal failure (Tr. 251). Dr. Galphin's assessment was: (1) advanced chronic renal failure secondary to FSGN; (2) status post left forearm AV fistula; (3) anemia; (4) hyperlipidemia; (5) hypertension; and (6) obesity (*id.*).

Dr. Galphin saw Plaintiff for yet another follow-up visit on June 19, 2003 (Tr. 284-86). Plaintiff indicated she had been doing well since her last evaluation, she was dieting and walking and continued to lose weight (Tr. 284). Dr. Galphin's assessment was: (1) advanced chronic renal failure secondary to FSGN; (2) status post left forearm AV fistula; (3) anemia; (4) hyperlipidemia; (5) obesity; and (5) hypertension (*id.*). Plaintiff's blood pressure was 141/86 and she weighed 232 pounds (Tr. 285). Dr. Galphin described Plaintiff as completely independent and able to do all chores without slowness (*id.*).

Plaintiff again saw Dr. Galphin for a follow-up visit on August 8, 2003 (Tr. 281-83). She had experienced no significant problems since her last examination (Tr. 281). Dr. Galphin's assessment was: (1) advanced chronic renal failure, secondary to FSGN; (2) status post left forearm

13

AV - fistula; (3) anemia; (4) hyperlipidemia; (5) obesity; and (6) hypertension (*id.*). Plaintiff's blood pressure was 149/88 and she weighed 225 pounds (Tr. 282).

Plaintiff was again seen by Dr. Galphin on October 10, 2003, for a follow-up visit (Tr. 278-80). His impression was: (1) advanced chronic renal failure, secondary to FSGN; (2) status post left forearm AV fistula; (2) anemia; (3) hyperlipidemia; (4) obesity; and (5) hypertension (Tr. 278). Dr. Galphin indicated he had discussed the symptoms of kidney failure with Plaintiff and she was to contact his office if such symptoms occurred (*id.*). He stated Plaintiff was completely independent and able to do all chores without slowness (Tr. 279).

A monthly dialysis summary dated November 28, 2003, from Dr. Galphin appears in the record (Tr. 250). Dr. Galphin indicated Plaintiff underwent her first dialysis treatment on November 10, 2003 (*id.*).

Plaintiff was admitted to Parkridge Medical Center on November 11, 2003, when she developed problems with shortness of breath and fever (Tr. 301). Plaintiff was discharged from the hospital on November 17, 2003 (Tr. 303). The discharge diagnosis was: (1) right lower lobe pneumonia; (2) end-stage renal disease, status post new initiation hemodialysis; (3) anemia, status post transfusion; (4) obesity; (5) status post placement of right internal jugular hemodialysis catheter; (6) hypertension, improved; and (7) elevated lipids (*id.*).

A handwritten statement on a prescription pad page appears in the record (Tr. 295). The note states, "Dr. Galphin does not complete physical disability forms. This will need to be completed by a physician who does physical disability exams." (*id.*). The note is attached to a blank medical source statement of the ability to do work related activities (Tr. 296-98).

On September 5, 2002, a surgeon, Dr. Luke Erdoes, saw Plaintiff in follow-up after placing

a Cimino fistula on Plaintiff's left wrist in anticipation of her need for dialysis (Tr. 371). Dr. Erdoes saw Plaintiff in follow-up of the fistula on October 21, 2002 (Tr. 370). He commented he believed the fistula would ultimately be usable for dialysis, although Plaintiff did not yet need dialysis (*id.*). Dr. Erdoes again saw Plaintiff in follow-up on December 19, 2002, and commented the fistula was developing (Tr. 368). In another follow-up on March 3, 2003, Dr. Erdoes noted Plaintiff was still not on dialysis, but that the fistula was patent and would be usable (Tr. 367). In a further follow-up on June 9, 2003, Plaintiff was experiencing pain and Dr. Erdoes' impression was that she had developed gout in her left wrist (Tr. 366). Dr. Erdoes saw Plaintiff for a final follow-up on the fistula on December 8, 2003 (Tr. 365). He indicated Plaintiff needed dialysis, but that it was evident based upon a fistulogram the fistula could not be readily accessed (*id.*).

On November 17, 2003, Dr. Erdoes placed a catheter in Plaintiff's right internal jugular for dialysis (Tr. 299-300). Dr. Erdoes' post-operative diagnosis was end stage renal disease with need for chronic hemodialysis access (Tr. 299).

Dr. Erdoes performed a ligation of an arteriovenous fistula on Plaintiff's left wrist on January 21, 2004 (Tr. 360-61). His post operative diagnosis was end-stage renal disease with a need for chronic hemodialysis access (Tr. 361). Dr. Erdoes saw Plaintiff concerning the ligation of her fistula on February 2 (Tr. 359), March 2 (Tr. 358), and August 23, 2004 (Tr. 357).

Handwritten progress notes from Comprehensive Medical Care, P.C. for the period from July 2002 through November 2004 appear in the record (Tr. 305-19, 321-25), but much of these handwritten notes are unintelligible. A letter from Dr. Farhan Rizvi, M.D. at Comprehensive Medical Care, P.C., concerning his treatment of Plaintiff also appears in the record (Tr. 320). The letter, which is dated May 30, 2003, states in pertinent part that Plaintiff has been a patient of Dr.

Rizvi since July 3, 2002 and "is being treated for hypertension, chronic renal failure and high cholesterol" (*id.*).

A blank assessment form for Plaintiff's ability to do work related activity appears in the record (Tr. 349-52). A post-it note from Dr. Geer's office appears on the first page of the assessment form (Tr. 349). It states, "Unable to assess. Pt. has not been in the office since 2001" (*id.*).

An assessment form of Plaintiff's ability to engage in work related activity signed by Sherry Ray, M.S.W. at the dialysis clinic and dated November 24, 2004, appears in the record (Tr. 353-56). Ms. Ray indicated Plaintiff could occasionally lift ten pounds, based upon her observation of Plaintiff carrying a few small objects into the dialysis clinic three times per week (*id.*). Ms. Ray also indicated Plaintiff's ability to stand and or walk was affected by Plaintiff's need for dialysis treatment three times per week (*id.*). Ms. Ray further indicated Plaintiff's ability to sit would be affected by her need to periodically alternate between sitting and standing (Tr. 354).

A blank assessment of Plaintiff's ability to engage in work related activity which was sent to Dr. Bess Ingram, M.D. appears in the record (Tr. 374-77). A notation on the form states, "Unable to answer Patient not seen since 1999" (Tr. 374).

A letter from Dr. Claude Galphin dated January 4, 2005, appears in the record (Tr. 378). The letter states that Plaintiff:

> was diagnosed with End Stage Renal Disease secondary to Focal Glomerulosclerosis and began chronic hemodialysis treatment on 11/10/2003. She has continued to require three times weekly dialysis treatments to manage her kidney failure. She had also been diagnosed with Hypertension, Anemia and Arthritis. She has reported difficulty with ambulation and chronic pain related to her Arthritis and has experienced chronic fatigue related to her kidney failure and anemia. Due to her ongoing health problems, she has continued to be unable

16

to work.

(*id.*).

The results of numerous laboratory reports also appear in the record (Tr. 182-220, 238-39, 287-92, 326, 332-33, 337-44, 346-47, 362-64, 373).

### Testimony at the administrative hearing

Plaintiff appeared *pro se* at the administrative hearing and waived her right to representation (Tr. 381). She was 55 years old and had a tenth grade education (Tr. 382). Plaintiff lived with her husband, who was retired (Tr. 382-83). Plaintiff testified her sole employment was as a presser at a dry cleaners (Tr. 383). Plaintiff stated she became disabled on January 1, 1999, and has not worked anywhere since then (*id.*).

The ALJ asked Plaintiff if she understood that her date of last insured was at the end of December 1999 and she would have to establish that she was disabled prior to the date of her last insured (Tr. 383-84). Plaintiff indicated she understood she would have to establish disability prior to the end of her insured period for DIB (Tr. 384).

Plaintiff testified in 1999 she began having problems with high blood pressure, which she was never able to get under control (*id.*). Plaintiff stated she could not work in 1999 because her blood pressure was too high to allow her to work and the medication she was taking for her high blood pressure made her sleep all the time (Tr. 385-86). Plaintiff was still taking medication at the time of the hearing for high blood pressure; and said she was never able to get her high blood pressure under control (*id.*). Plaintiff also testified her high blood pressure eventually caused her kidneys to fail (Tr. 385). Plaintiff testified all of her problems in 1999 related to her high blood pressure and anemia (Tr. 386). Plaintiff stated she just stayed at home and did nothing during that

17

period of time (*id.*).  Plaintiff stated her primary problem in 1999 was "really high blood pressure" (Tr. 387).

Plaintiff's daughter, Alfreda Fletcher, testified her mother's blood pressure was very high in 1999 and she was taking numerous medications to reduce it (Tr. 388).  Ms. Fletcher stated her mother's high blood pressure was not controlled and eventually her mother developed kidney failure (*id.*).  Ms. Fletcher stated her mother's high blood pressure medication affected her mother's ability to work because as soon as her mother took her medication she would fall asleep (Tr. 389).  Ms. Fletcher stated her mother was taking medication for her high blood pressure three times a day and each time she would take her medicine she would fall asleep (Tr. 390).  Ms. Fletcher stated she was not aware of her mother experiencing kidney trouble in 1999 (*id.*).  Ms. Fletcher stated her mother's main trouble in 1999 was her high blood pressure and the effects of the medication she was taking for it (Tr. 390-91).

VE Friedlob also testified at the hearing (Tr. 391-92).  He testified Plaintiff's past work as a presser at a dry cleaner was "light work, semi-skilled, and an SVP of 3" (Tr. 392).

## Analysis

The ALJ found Plaintiff last met the insured status requirements on December 31, 1999, and must establish disability prior to that date (Tr. 16).  The ALJ also found Plaintiff was not disabled because she retained the RFC for light work, which permitted her to return to her past relevant work as a presser, through the relevant time period (Tr. 19).  Plaintiff asserts the ALJ's decision is not supported by substantial evidence [Doc. No. 17-1 at 1-4].

### *Substantial Evidence*

The critical issue is whether substantial evidence supports the ALJ's decision, and the Court

concludes it does. The ALJ noted Plaintiff testified her blood pressure was not controlled in 1999, she was anemic, and her medications caused fatigue (Tr. 17). The ALJ found Plaintiff was not receiving treatment in January 1999, the alleged onset date; and, although Plaintiff complained to Dr. Geer in November 1999 that her blood pressure medication was causing fatigue, Plaintiff's somnolence decreased after Dr. Geer adjusted her medication (*id.*). The ALJ explicitly found Plaintiff's subjective complaints were not credible (Tr. 18). In the absence of an assessment of Plaintiff's RFC from any treating physician, the ALJ credited the assessment of the reviewing physician, Dr. Perry, that Plaintiff retained the RFC for light work prior to the expiration of her insured status (*id.*). The ALJ acknowledged Plaintiff began experiencing chronic renal failure in November 2001, and, by November 2003, began undergoing dialysis. Although these conditions may be indicative of disability as they imposed more serious limitations on Plaintiff's RFC after Plaintiff last met the insured status requirements on December 31, 1999, the ALJ concluded they were not relevant for the purposes of his decision because Plaintiff did not begin to experience them until nearly two years after the expiration of her insured status (Tr. 17-18, 19).

Plaintiff challenges the ALJ's decision that she retained the RFC to perform light work through December 31, 1999, and that her RFC would have permitted her to return to her vocationally relevant past work as a silk presser at a dry cleaner (Tr. 19). The Court finds, however, substantial evidence supports the ALJ's decision Plaintiff retained the RFC to perform her past work as a silk presser for a dry cleaner through December 31, 1999.

The issue before the Court is Plaintiff's condition from the date she testified she became disabled, January 1, 1999, through the date Plaintiff last had insured status for DIB, December 31, 1999. In order to qualify for DIB, a claimant must have "insured status" in the quarter or month in

which the claimant becomes disabled. 42 U.S.C. §§ 416 (i)(3), 423(a)(1)(A) & (c)(1); 20 C.F.R. § 404.131 (2000). "Insured status" is calculated based on the earnings that a worker has reported. 20 C.F.R. §§ 404.132 - 141 (2000). To be entitled to DIB, a claimant must be "under a disability" as of the date his insured status expired. 42 U.S.C. § 416(i); 20 C.F.R. §§ 404.131(a), 404.320(b)(2); *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988) (per curiam); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990). Unless a claimant proves this, she may not receive DIB even if she becomes unable to work after her insured status expires. It is not enough to establish the inception of an impairment which later becomes disabling – the impairment must reach disabling severity during the insured period. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987) (per curiam) (report was "minimally probative" where doctor saw claimant eight months after expiration of insured status).

The ALJ found the Plaintiff's impairments from late 2001 forward, when she developed chronic renal failure which eventually resulted in the need for dialysis, imposed more serious limitations on Plaintiff's RFC which might preclude any full-time work (Tr. 18-19). The ALJ also found no such level of limitation to Plaintiff's RFC was demonstrated in the record on or before December 31, 1999 (Tr. 19). The Court agrees the Plaintiff has not met her burden of showing her impairments were of disabling severity *prior* to December 31, 1999. *See Moon*, 923 F.2d at 1182 (claimant has the burden of showing she became disabled prior to the date last insured).

The ALJ credited Dr. Helena Perry's assessment that during the relevant period of time Plaintiff had the residual functional capacity for light work. Dr. Perry is not a treating physician of Plaintiff. She reviewed Plaintiff's medical records and gave an assessment of Plaintiff's RFC for the relevant time period. Although a treating physician's opinion typically is entitled to substantial

20

deference, *see Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2), no opinion or assessment from a treating physician appears in the record despite the fact such assessments were sought. The responsibility for weighing evidence of record rests with the ALJ. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

Plaintiff contends her "history of uncontrolled hypertension and high blood pressure manifested itself in the form of chest pain and fatigue, which caused depressive symptoms. The medications caused side effects rendering the Plaintiff incapable of working full-time work in her occupation as a Presser Operator in a Laundry facility." [Doc. No. 17-1 at 1]. Plaintiff further asserts that "[f]ollowing January 1, 1999, the record supports that the Plaintiff's medical condition worsened leading to end stage renal failure and dialysis treatments 4 days per week 4 hours per day" (*id.*).

The Court agrees the record documents Plaintiff suffered from uncontrolled and/or poorly controlled hypertension not only prior to December 31, 1999, but also subsequent thereto. It is Plaintiff's burden, however, to show that the limitations caused by her hypertension or the medications she took prevented her from performing her past relevant work or any significant gainful activity prior to the expiration of her DIB insured status. No treating or examining physician opined Plaintiff was unable to work in 1999.

Further, during the January 18, 2005 hearing, Plaintiff stated her primary problem in 1999 was "really high blood pressure" (Tr. 387) and she stated she could not work in 1999 because her high blood pressure was too high to allow her to work and the medications she was taking for her high blood pressure made her sleepy all the time (Tr. 385). Plaintiff's daughter also testified her mother's main trouble in 1999 was her high blood pressure and the effects of the medications she

was taking for it (Tr. 390-91).

When Plaintiff saw Dr. Johnson on October 19, 1999, she told Dr. Johnson she had not taken any blood pressure medication for about a year (Tr. 139). When Plaintiff saw Dr. Geer on November 22, 1999, however, she told Dr. Geer the Clonidine she was taking for her hypertension made her extremely fatigued and sleepy (Tr. 179). Plaintiff also told Dr. Geer she had no other exertional complaints except for a feeling her heart was beating harder and faster after consuming a cold beverage (*id.*). Dr. Geer stated he had advised Plaintiff on the manner in which she was to take her medications and he was decreasing her daily dosage of Catapres because it was causing extreme sleepiness (Tr. 180).

Two days later, on November 24, 1999, Dr. Geer saw Plaintiff for a follow-up (Tr. 178). He indicated she was doing well since her last visit and "had not had any problems and has less somnolence since being on the lower dosage" of her medication (*id.*). Dr. Geer saw Plaintiff on January 5, 2000, and indicated she was doing well on her current regimes of medication (Tr. 176). No complaints of fatigue or somnolence are mentioned by Dr. Geer in his report of the January 5, 2000 examination of Plaintiff. Further, Dr. Geer strongly recommended to Plaintiff that she enroll in an exercise program because weight reduction and dieting, as opposed to medication, should be the next step in managing Plaintiff's hypertension (*id.*).

Plaintiff reported to Dr. Geer on February 8, 2002, that she was not taking all of her high blood pressure medication on the advice of the nurse who was prescreening Plaintiff for her hysterectomy (Tr. 175). When Plaintiff returned for a follow-up on April 5, 2000, however, Dr. Geer reported "[s]he has been doing well recently with no major complaints at this time." (Tr. 174).

Dr. Geer noted Plaintiff's complaints that her blood pressure medication was causing fatigue

and adjusted her medication to address this complaint on November 22, 1999 (Tr. 179-80). When Plaintiff saw Dr. Geer for a follow-up two days later on November 24, 1999, the fatigue resulting from her hypertension medication had already been reduced. There is no evidence that within the relevant period of time, Plaintiff's ability to perform work-related activity was limited by the side effects of her blood pressure medication (Tr. 178). *See Burns v. Barnhart*, 312 F.3d 113, 131 (3d Cir. 2002) ("Drowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations.").

It appears from the record that during much of the relevant period of time, from January 1, 1999 through October 19, 1999, Plaintiff was not taking medication for her hypertension. Although there is reference in the record suggesting that between October 19, 1999 and December 31, 1999 one of the medications Plaintiff was taking for her hypertension did cause some fatigue, no examining or treating physician documented drowsiness stemming from Plaintiff's medication at a level serious enough to impose an additional functional limitation on her RFC.

***Subjective Complaints***

The ALJ concluded Plaintiff's subjective complaints, including pain were not fully credible relative to the period ending December 31, 1999 (Tr. 19). Plaintiff complains the ALJ did not properly weigh her subjective complaints, stating that "despite the Plaintiff's complaints of significant pain and other limitations, the Administrative Law Judge's decision contains no credibility analysis." [Doc. No. 17-1 at 1-2]. She further states, "[i]n 1999, no one but the Plaintiff knew how much pain and agony she was in which limited her from performing full-time work" (*id.*).

Contrary to Plaintiff's assertion, the ALJ's decision does contain findings as to Plaintiff's credibility. The decision states in pertinent part:

At the hearing, the claimant testified that during 1999, her blood pressure was not controlled, she was anemic, and prescribed medications caused drowsiness. She underwent a hysterectomy during that time. She testified her kidneys later failed and she is currently on dialysis. Her daughter's testimony essentially corroborated that of the claimant, with both suggesting the claimant's impairments during the period at issue were blood pressure and sleepiness caused by medications . . . .

. . .

I have considered the claimant's subjective complaints relative to the period ending December 31, 1999. In doing so, I have considered the credibility of the claimant's allegations with regard to: daily activities; the locations, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness and side effects of medications; treatment, other than medications; and other factors concerning the claimant's functional limitations due to pain or other symptoms (SSR 96-7p). While Dr. Geer's records reflect side effects of Clonidine including drowsiness, he noted improvement in drowsiness immediately following reduction in the dosage, and notes fail to reflect ongoing complaints of adverse effects. Suboptimal control of blood pressure is established; however, the evidence fails to reflect related symptoms which would be expected to preclude all work activity at any exertional level, as alleged. When the claimant was hospitalized for a hysteroscopy in October 1999, she reported she had not taken medications for hypertension in one year. It would seem unlikely she would have failed to do so if he had been experiencing debilitating symptomatology.

[Tr. 17, 18].

A claimant's self-reported claims of disabling pain are not, standing alone, sufficient to establish disability. *See* 20 C.F.R. §§ 404.1529(a) and 416.929(a). First, such claims must be supported by objective medical evidence (*i.e.*, medical signs and/or laboratory findings) of an underlying medical condition and, second, either (1) the objective medical evidence must confirm the severity of the alleged pain, or (2) the objectively established medical condition must be of such a severity that it can be reasonably expected to produce the alleged pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994); 20 C.F.R. §§ 404.1529(a) and 416.929(a). Finally, the intensity

and persistence of the claimant's symptoms must be evaluated to determine whether those symptoms limit the claimant's capacity for work.  20 C.F.R. §§ 404.1529(c)(1) and 416.929(c)(1).

Relevant evidence for the ALJ's determination includes the claimant's medical history, statements by treating physicians, medications taken, medical treatment other than medication received to relieve pain or other symptoms, methods the claimant has used to relieve pain, precipitating and aggravating factors, daily activities, and statements by the claimant.  20 C.F.R. §§ 404.1529(c) and 416.929(c).  Ultimately, it is the functional limitations imposed by a condition rather than the diagnosis itself which determines whether an individual is disabled.  *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).  Pain caused by an impairment can be disabling, but each individual has a different tolerance of pain.  *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 367 (6th Cir. 1984).  Thus, a determination of disability based on pain depends in part on the credibility of the claimant.  *Id.*; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981).  In determining credibility, the ALJ considers, among other things, whether there are any inconsistencies between the claimant's statements and the rest of the evidence.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).  Because the ALJ is charged with the responsibility of observing the demeanor and credibility of the witness, his conclusions should be highly regarded.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).

Although it is true that only Plaintiff experienced her own pain during the relevant period, the ALJ set forth a detailed discussion of Plaintiff's subjective complaints.  Plaintiff and her daughter testified during the administrative hearing that Plaintiff's hypertension and the fatigue from the medication she took for hypertension were Plaintiff's primary limitations in 1999 (Tr. 385, 391).

25

On October 19, 1999, Plaintiff told Dr. Johnson she had not taken any high blood pressure medication for about a year (Tr. 139), although Plaintiff told Dr. Geer on November 22, 1999, the dosage of Clonidine she was taking for her hypertension made her fatigued and sleepy (Tr. 179). Dr. Geer adjusted the dosage and two days later reported Plaintiff was experiencing less somnolence (Tr. 178). On January 5, 2000, Dr. Geer reported Plaintiff was doing well on her current regime of medication (Tr. 176); and, he did not record any complaints of somnolence or fatigue.

Plaintiff underwent a dilatation and curettage on October 20, 1999 (Tr. 135-37). In the statement Dr. Johnson completed for Plaintiff's employer on October 25, 1999, Dr. Johnson indicated Plaintiff would need care and assistance for two to four weeks after she was discharged from the hospital, but Dr. Johnson expected recovery in three months (Tr. 143, 144).

In her memorandum in support of her motion for a summary judgment, Plaintiff also mentions headaches and lower extremity edema as disabling impairments in addition to her hypertension/high blood pressure [Doc. No. 17-1 at 2]. When Dr. Geer examined Plaintiff on November 22, 1999, he found "some mild edema of both lower extremities." (Tr. 180). When Dr. Geer saw Plaintiff two days later, on November 24, 1999, he did not mention edema (Tr. 178); and as a result of his physical examination of Plaintiff on January 5, 2000, Dr. Geer found "no significant edema." (Tr. 176).

Further, on November 22, 1999, Dr. Geer commented that Plaintiff "was recently given a nitroglycerin patch which she states has caused a considerable amount of headache. She is not wearing the patch today" (Tr. 179). No other reference to headaches appears in Dr. Geer's notes during the period from November 22, 1999 through January 5, 2000 (Tr. 176-81). Moreover, when Dr. Johnson performed her physical examination of Plaintiff on October 19, 1999, she stated that

Plaintiff "denied any chest pain, any headaches or dizziness." (Tr. 139). Thus, the Court concludes substantial evidence supports the ALJ's finding that Plaintiff's subjective complaints were not fully credible during the relevant period.

***Additional Evidence***

Plaintiff has also attached various documents, identified as exhibits A through G, to her memorandum in support of her motion for summary judgment [Doc. No. 17-1 at 2, 17-2 through 17-8]. With regard to Exhibits A through F [Doc. Nos. 17-2 through 17-7], Plaintiff states:

> The administrative record does not contain any documentation from the Plaintiff's treating physician regarding the Plaintiff's physical and mental capacity during the period of time in question, 1999. The medical records and treatment notes document severe hypertension, headaches, high blood pressure, and lower extremity edema. The Plaintiff maintains that this was the beginning of her failed health and attaches Exhibits A-F to this [sic] motion for summary judgment.
>
> Exhibit A from the United States National Library of Medicine, documents that being overweight can lead to high blood pressure, hypertension and related complications. The Plaintiff maintains that her obesity, uncontrolled hypertension and high blood pressure led to her kidney failure and subsequent dialysis . . .

[Doc. No. 17-1 at 2]. Exhibits A through F [Doc. Nos. 17-2 through 17-7] are medical literature relating to obesity and health downloaded by the Plaintiff from the internet, not medical evidence relating to Plaintiff's condition during the relevant period. To the extent Plaintiff is attempting to argue the ALJ did not consider her obesity, this argument fails. In his decision, the ALJ explicitly stated he had "considered the combined effects of obesity with other impairments, and have considered the effects of obesity not only under the listings, but also in assessing this claim at all steps of the sequential evaluation process, including the assessment of claimant's residual functional

27

capacity." (Tr. 18). Plaintiff's obesity is well-documented in the record. Moreover, although Dr. Geer recommended Plaintiff enroll in a cardiac rehabilitation program because he felt weight reduction and dieting would have a beneficial effect on the management of her hypertension (Tr. 176), no evidence suggests Plaintiff's obesity imposed any functional limitation on her RFC for light work during the relevant period of time. Although Plaintiff may be correct that her obesity eventually led to her kidney failure and subsequent dialysis, it did not do so during the relevant time period prior to December 31, 1999.

With regard to Exhibit G [Doc. No. 17-8], Plaintiff states she "did make an attempt or trial return to work sometime in 2002 as evidence [sic] by the pay check stubs from the State of Tennessee (Exhibit G)[.] This is evident [sic] that the Defendant must re-establish the dates the Plaintiff last met the earnings requirements." [Doc. No. 17-1 at 2]. Exhibit G shows that Plaintiff received a remittance from the Department of Human Services of the State of Tennessee for child care assistance on May 22, 2002; June 5, 2002; and July 31, 2002 [Doc. No. 17-8]. This evidence does not appear in the administrative record. Thus, it does not appear this evidence was ever presented to either the ALJ or the Appeals Council.

When an ALJ renders the final decision of the Commissioner, additional evidence presented after the ALJ's decision should be considered only for purposes of a remand pursuant to the sixth sentence of 42 U.S.C. § 405(g). *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992). A district court may remand a case to the ALJ to consider additional evidence "only upon a showing that there is (1) new evidence which is (2) material and that (3) there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *accord Foster v. Halter*, 279 F.3d 348, 357

(6th Cir. 2001). Good cause is shown when the claimant gives a valid reason for failing to obtain relevant evidence prior to the hearing. *See Cotton*, 2 F.3d at 696. Additional evidence is material only if the claimant can demonstrate there is a "reasonable probability" that the ALJ would have reached a different conclusion on the issues of disability if he had been presented with the additional evidence. *See Sizemore v. Sec'y of Health & Human Servs.,* 865 F.2d 709, 711 (6th Cir. 1988). Additional evidence is new if it was not in existence or available to the claimant at the time of the administrative proceedings. *See Sullivan v. Finkelstein*, 496 U.S. 617, 626, 110 S. Ct. 2658, 2664, 110 L. Ed. 2d 563 (1990). The party seeking remand has the burden to show that remand is appropriate. *See Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986); *Foster*, 279 F.3d at 357.

The evidence in Exhibit G to Plaintiff's memorandum in support of her motion for summary judgment clearly did exist at the time of the January 18, 2005 hearing and when the ALJ issued his decision on March 21, 2005 (Tr. 13-20). Plaintiff has not advanced any reason for why this evidence was not presented to the ALJ. Further, in the disability report which Plaintiff completed on June 10, 2003, she indicated she did not work at any time after her illness, injury, or medical condition first bothered her (Tr. 64); and, at the hearing Plaintiff explicitly testified in response to a question from the ALJ, that she had not worked anywhere since January 1, 1999 (Tr. 383). The Commissioner asserts "[t]he check stubs submitted by Plaintiff show only that she received child care assistance from the Tennessee Department of Human Services, not work activity." [Doc. No. 23 at 10]. The Court concludes Plaintiff has not satisfied her burden of showing a remand under sentence six of 42 U.S.C. § 405(g) to consider the evidence in Exhibit G is warranted. First, the Court cannot determine whether the evidence would result in any change to the date of Plaintiff's

last insured for DIB purposes. Second Plaintiff has not shown any reason for her failure to present this evidence to the ALJ at the administrative hearing. Moreover, even if Plaintiff did not have the documentation to present at the hearing, she has not explained her failure to tell the ALJ she worked or attempted a trial work period in 2002, which might have alerted the ALJ to the need to hold the record open to obtain evidence. Rather, both in her disability report in 2003 and at the hearing, Plaintiff indicated she had not worked since January 1, 1999.

Lastly, Plaintiff also "maintains that her obesity, uncontrolled hypertension and high blood pressure led to her kidney failure and subsequent dialysis." [Doc. No. 17-1 at 2]. In his decision, the ALJ stated, "[I]n November 2001, the claimant was evaluated due to chronic renal failure, and by November 2003, dialysis was instituted. While renal failure is clearly a very limiting condition, the evidence establishes the claimant did not experience related difficulties until almost two years following the expiration of insured status in December 1999" (Tr. 17-18). The ALJ further commented in his decision that "during late 2001 and forward, the claimant developed chronic renal failure and was more limited; however, the time period at issue ended December 31, 1999 and such restrictions were not present during that time." (Tr. 18-19). Plaintiff may be correct that her uncontrolled hypertension and obesity eventually culminated in renal failure and the need for dialysis and that she eventually became disabled as the result of those conditions. A thorough review of the medical evidence of record, however, shows that substantial evidence supports the ALJ's conclusion that neither renal failure nor the need for dialysis were present or had manifested themselves prior to December 31, 1999. Therefore, substantial evidence supports the ALJ's finding Plaintiff was not disabled prior to the expiration of her insured status on December 31, 1999.

Therefore, it is **RECOMMENDED** that: (1) the decision of the Commissioner be

**AFFIRMED**; (2) the Defendant's motion for summary judgment [Doc. No. 22] be **GRANTED**; and

(3) the Plaintiff's motion for summary judgment [Doc. No. 16] be **DENIED**.

## Conclusion

Having carefully reviewed the administrative record and the briefs of the parties filed in support of their respective motions, for the reasons stated above it is **RECOMMENDED**[3]:

(1)      Plaintiff's motion for a summary judgment [Doc. No. 16] be **DENIED**;

(2)      Defendant's motion for summary judgment [Doc. No. 22] be **GRANTED**;

(3)      Judgment be entered pursuant to Rule 58 of the Federal Rules of Civil Procedure **AFFIRMING** the Commissioner's decision which denied benefits to the Plaintiff; and

(4)      This action be **DISMISSED**.

s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[3] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).